## In the District Court of the United States
## For the District of South Carolina
### BEAUFORT DIVISION

| | | |
|---|---|---|
| **Dennis L. Snipes, Jr.,** | ) | |
| | ) | Civil Action No. 9:07-3516-CMC-GCK |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **Cecilia Reynolds, Warden,** | ) | **OF THE MAGISTRATE JUDGE** |
| | ) | |
| Respondent. | ) | |
| | ) | |

## I.   INTRODUCTION

The Petitioner, Dennis L. Snipes ("Petitioner" or "Snipes"), a state prisoner proceeding with the assistance of counsel, seeks *habeas corpus* relief under Title 28, United States Code, Section 2254. By definition, the relief which he seeks must be based upon a finding that he is being illegally detained in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2241(c)(3). This case is before the undersigned United States Magistrate Judge pursuant to the provisions of Title 28, United States Code Section 636(b)(1)(A) and (B), and Local Civil Rules 73.02(B)(2)(c) and (e), D.S.C. The above-named Respondent has filed a motion for summary judgment in this case [17], and the Report is prepared for review by the District Court.

## II.   PROCEDURAL HISTORY IN STATE COURT

### A.  Proceedings in the Court of General Sessions

Petitioner initially was charged by information with criminal sexual conduct with a minor. On May 15, 2000, the charge against him was dismissed for lack of probable cause. On June 15, 2000, the Lancaster County Grand Jury indicted Petitioner during the June 2000 term of

court for criminal sexual conduct (CSC) with a minor in the first degree (00-GS-29-779).[1]  (R. 243-43)  Two years later, on February 15, 2002, Petitioner was arraigned, and was represented by Attorney Stacy Lewis on this charge.  Another two and one-half years passed before his jury trial commenced on August 3-4, 2004, before the Honorable James E. Lockemy.

The testimony before the court that the six-year old victim ("T.W.") lived with her mother and younger brother "C.W.", in a trailer in Lancaster County.  At the time, Petitioner was living with T.W.'s mother.  Their child, D., also lived there.  (R. 58, 70-71, 78, 150).  T.W. testified that she referred to Petitioner as "Daddy" when she lived there.  (R. 78).

T.W., who was eleven years old at the time of trial, recalled that her mother left with D. on the morning in question, to get him a haircut. T.W. was left alone with C.W. and Petitioner. Petitioner called her into his bedroom while she was folding clothes in the living room.  (R. 82-84).  When she walked inside, he was on his bed, and he told her to shut the bedroom door. (R. 84-86).  Petitioner then ordered her to remove her clothes or she would get in trouble or be spanked.  T.W. took off her clothes.  Petitioner pulled down his pants and told her "to suck his private part" or he would spank her.  He was on the bed with his legs spread apart. T.W. climbed onto his bed, and she was on her stomach facing the headboard with her head between his legs. T.W. performed oral sex on Petitioner while he rubbed her back.  T.W. recalled that she did not gag, but "I just felt really like sick in my throat."  She did not see Petitioner ejaculate.  (R. 86-89, 99-101, 109).

When she stopped performing oral sex, she rolled on her back.  Petitioner told her to close her eyes and turn her head.  He then went into the bathroom for "just a couple of seconds"

---

[1]     Under S.C. Code Ann. §16-3-655(1) (2003), "a person is guilty of criminal sexual conduct in the first degree [with a minor] if the actor engages in sexual battery with a victim who is less than eleven years of age."  S.C. Code Ann. §16-3-651(h) (2003) defines sexual battery as "sexual intercourse . . . anal intercourse, or any intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body."  Pursuant to §16-3-657, in prosecutions for criminal sexual conduct, "the testimony of the victim need not be corroborated."  *State v. Burroughs*, 328 S.C. 489, 492 S.E.2d 408 (Ct. App. 1997).

and came out with "something in his hands."  Petitioner put a rag on her stomach and she had a cold "watery feeling" on her stomach.  (R. 89-90)  T.W. opened her eyes, got up, and put on her clothes.  Petitioner had already put his pants on.  He told T.W. not to tell anyone what happened, or she would be get in trouble and be spanked.  (R. 90-91).  T.W. returned to folding clothes.

When T.W.'s mother came home, T.W. told her what had happened.  (R. 91-92).  T.W.'s mother took her and C.W. to her sister's house, and the police were contacted.  (R. 92-93, 112-13) .  The sister, Rhonda Powers, testified that T.W. appeared to be scared, and she had been crying.  She described her sister as "hysterical."  (R. 114-16).  T.W. was subsequently taken to the hospital for an examination.  (R. 141-42, 145).

The police responded to the call that afternoon.  They spoke with T.W., and then went to her house.  (R. 123-25, 191-92).  They found Petitioner in the living room, with his father.  There was a handgun on the couch.  Petitioner was handcuffed for his own safety, and taken into custody without incident.  (R. 125-28, 136, 193-95).  Petitioner told the officers that he had been watching a pornographic videotape, when T.W. walked in on him.  The video showed someone performing a lewd act in the back seat of a car and he told her that if she stole money from her mother again, he "would make her do that to him."  (R. 201, 281)

T.W.'s mother, Joanne, provided a written statement to the police the day of the incident.  (R. 151). Referring to the statement at trial, Joanne testified that she returned home with her son and talked with T.W.  (R. 155-57).  Joanne then confronted Petitioner about T.W.'s accusation.  She said that Petitioner told her he showed "it" to T.W. and that "he wouldn't do anything to hurt our family."  Petitioner told her that T.W. caught him as he watched a pornographic movie they kept in the house.  (R. 157-58, 182).

Joanne stated that she had thyroid cancer and it impaired her sexual relationship with Petitioner.  She explained that they sometimes watched pornography borrowed from friends as a marital aid.  (R. 167-70, 182-83). In fact, they had a pornographic videotape in the house, but they hid it away from the children.  (R. 168-69).  Joanne admitted that she did not reveal this

information to the police in her statement. (R. 160). She could not recall whether Petitioner admitted telling T.W. that if she stole money again, "I'm going to make you suck my penis" like it was shown in the videotape. (R. 162). Joanne testified that she did not believe T.W.'s story; and that she had married Petitioner in April 2003. (R. 149-50, 177; 249).

Petitioner gave a written statement to the police after his arrest. He claimed in the statement that the children were folding the clothes when he started watching a pornographic videotape that showed a woman performing oral sex. T.W. walked into the bedroom and saw it before he could turn off the television. T.W. described what she saw as "'nasty.'" Petitioner alleged that T.W. had stolen $60.00 from her mother in the past, and he told her on the date of the offense that if she stole money from her mother, "I will do you like that." (R. 210-12).

The police seized a wash cloth and two T-shirts from T.W.'s house to test for the presence of semen. (R. 128-29, 132-34, 139-40). However, no semen was detected on any of these items, (R. 232-36, 238-39), or on T.W.'s body. (R. 146-47). The police never searched Petitioner's house for the videotape. (R. 224-25).

Petitioner testified at trial that T.W. walked in and startled him while he watched a portion of a pornographic movie in the bedroom. He said that a woman in the movie was performing oral sex on a man, who then ejaculated on the man's shirt. T.W. told Petitioner "that's nasty." He screamed at her, and he told her that "if you ever steal money again from your mama I'll do you like that." T.W. then ran down the hallway and into her bedroom. (R. 253-55, 267-68, 272).

Petitioner testified at trial that he would never do that to T.W.. He only said it because he was startled by T.W., and his response "just popped in my head." (R. 258-59, 272). He testified that T.W. had stolen money from her mother on a prior occasion. (R. 257-58). Petitioner stated that he never touched T.W. inappropriately and that he did not commit the act alleged. (R. 260, 262). He claimed that the allegation against him was consistent with the scene on the videotape, and he said that T.W. made her story up. (R. 262, 281).

However, T.W. testified that she did not see any videotape inside her home.  She also denied that she ever stole money from her mother's purse.  (R. 82-83).

The jury found Petitioner guilty, as charged; and Judge Lockemy sentenced him to ten years imprisonment.  (R. 4-340; 344).

### B.  Petitioner's State Court Appeals

Petitioner timely served and filed a notice of appeal.  Lorilee M. Gates, Esquire, of The Chase Law Group, in Studio City, California, and John Hardaway, Esquire, of Columbia, South Carolina, represented him on appeal.  (Resp. Ex. 4).  On April 17, 2006, Petitioner submitted his Final Brief of Appellant, in which he presented two issues for review:

I.       Whether Appellant's speedy trial rights were violated.

II.      Whether the trial court erred in denying Appellant's motion for directed verdict.

(Resp. Ex. 4 (Final Brief of Appellant at p. 4)).  Appellant submitted a Final Reply Brief of Appellant at the same time.  (Resp. Ex. 3).  The State filed a Final Brief of Respondent on June 5, 2006.  (Resp. Ex. 5). Assistant Attorney General Norman Mark Rapoport represented the State on appeal.

On October 24, 2006, the South Carolina Court of Appeals affirmed Petitioner's conviction and sentence in an unpublished Opinion.  *State v. Snipes*, 06-UP-363 (S.C. Ct.App., Oct. 24, 2006) (per curiam).  (Pet. Ex. A; Resp. Ex. 6).  On October 31, 2006, Petitioner's California Counsel, Ms. Gates, wrote to Petitioner at the South Carolina Department of Corrections' ("SCDC's") Allendale Correctional Institution to inform him of the decision and also tell him that if he wished to seek certiorari , the petition for a rehearing under Rule 226(c) and (d) must be filed with the court (and not just post-marked) by 5:00 p.m. on November 9, 2006.  This letter was signed by both Ms. Gates and by Mr. Hardaway.  (Pet. Ex. D).

Petitioner did not file a Petition for Rehearing within fifteen days, see Rule 221, SCACR, the South Carolina Court of Appeals sent the Remittitur to the Lancaster County Clerk of Court

on November 13, 2006.[2]  (Pet. Ex. B).  The undersigned notes that both Ms. Gates and Mr.

Hardaway were copied on this latter from the Court of Appeals.  (Resp. Ex. 7).

At some point, Petitioner retained Susan L. Ferguson, Esquire, another member of the

Bar of the State of California, to represent him.  Ms. Ferguson thereafter filed a Motion to Recall

the Remittitur and Request for Leave to File a Petition for Rehearing, with supporting

attachments, on Petitioner's behalf, alleging that his appellate attorney failed to timely notify

him of the Court of Appeals decision rendered on October 24, 2006 because counsel's October

31 letter had been inadvertently sent to Petitioner at the Allendale Correctional Institution

instead of the Kershaw Correctional Institution..  (Pet. Memo. [14] at p. 5).

This motion was dated January 26, 2007 and it was received by Respondent on January

30, 2007.  In the motion, Ms. Ferguson noted that previous counsel informed Petitioner of the

decision by the Court of Appeals in a letter dated October 31, 2006, but alleged that Petitioner

did not receive the letter until November 14, 2006, because it had been sent to the wrong

correctional facility.  Ms. Ferguson admitted, however, that previous appellate counsel (Gates

and Hardaway) had advised Petitioner in their letter that it was their opinion the case did not

present circumstances under which Petitioner could petition for a writ of certiorari to the

---

[2]    Respondent submits that Snipes' conviction became final on that date for purposes of the statute of limitations governing the filing of applications for state Post-Conviction Relief, S.C. Code Ann. § 17-27-45(A) (Supp. 2007) because the state appellate courts no longer had subject matter jurisdiction after the Remittitur was sent.  He therefore does not have a state court remedy for any claims of ineffective assistance of trial or appellate counsel, since the one year limitations period in § 17-27-45(A) was not tolled by the filing of his Petition for writ of Habeas Corpus.  *See Green v. State*, 353 S.C. 29, 576 S.E.2d 182 (2003) (one-year period for filing an application for post-conviction relief was not tolled prior to exhaustion of state remedies by petitioner's pursuit of federal habeas corpus relief).  *See also Leamon v. State*, 363 S.C. 432, 611 S.E.2d 494, 496 (2005 ("Ignorance of the statute of limitations for filing a petition for post-conviction relief (PCR) is not an excuse for late filing, even when the petitioner claims he did not learn of the statute because he was incarcerated in another state").

Respondent also cites to *Sutton v. State*, 361 S.C. 644, 606 S.E.2d 779 (2004) for the proposition that neither trial nor appellate counsel had obligation to inform defendant of post-conviction remedies or of one-year limitations period governing petitions.  However, Sutton has been abrogated by *Bray v. State,* 366 S.C. 137, 620 S.E.2d 743 (2005) (per curiam).

Supreme Court.  Previous appellate counsel, Ms. Gates and Mr. Hardaway, further stated in their letter,  "I can say that I am at peace with the level of professionalism with which the Court handled your case. The opinion is thorough and reasoned, despite the fact that it is not the outcome we desired.  Please know that it is clear the Court acknowledged your claims and gave them respectful consideration."  (*See* Snipes' Motion to Recall Remittitur attached at Ex. 8 to Resp. Memo; and Exhibit C attached to Motion to Recall Remittitur).  Ms. Ferguson stated that as soon as Petitioner realized the deadline for filing a petition for rehearing had lapsed, he ultimately retained her to pursue this matter, and on December 12, 2006.Petitioner, through John S. Nichols, Esquire, moved to have Ms. Ferguson admitted *pro hac vice*.  Respondent filed a Return to Motion To Recall Remittitur on January 31, 2007, in which it opposed the motion to recall the Remittitur.

On March 6, 2007, the Court of Appeals filed two Orders.  In the first Order, it denied the motion to recall the Remittitur.  In the other Order, it found that the request for admission *pro hac vice* was moot.  (Resp. Ex. 11 and 12).

### III.  FEDERAL COURT HISTORY

The Petitioner is presently incarcerated in the Kershaw Correctional Institution of the South Carolina Department of Corrections ("SCDC").  Petitioner filed this Petition for a writ of habeas corpus (the "Petition") on October 24, 2007 against the above-captioned Respondent, Cecilia Reynolds, Warden of Kershaw Correctional Institution ("Respondent").  [1]  In his *pro se* Petition, Petitioner has raised the following grounds for relief:

| | |
|---|---|
| Ground One: | Petitioner's Speedy Trial Rights were Violated |
| Supporting Facts: | Petitioner was indicted in June of 2000 and not brought to trial until August of 2004.  The Solicitor conceded that there was no good reason for the delay. |
| Reasons for not exhausting your State remedies on Ground One: | Petitioner's appellate attorney did not notify me of the Court of Appeals' decision until after the Remittitur was issued. |

(Habeas Petition [1] at p. 6).

On October 24, 2007, the Petitioner also filed a motion for an extension of time to file a memo in support of the 2254 petitioner and a motion to *appear pro hac* vice by Susan L. Ferguson. On November 6, 2007, the undersigned issued an order granting the motion to appear *pro hac vice* [8] and on November 7, 2007 issued an Order which authorized service upon the Respondent, apprised the Respondent of the deadline for filing dispositive motions, and notified Petitioner of the change of address rule. [10] Also on November 7, 2007, the court issued an order finding the motion for extension of time moot and allowing the Petitioner to file a memorandum in support of the petition within 20 days. [11] The additional attachments were filed on November 27, 2007. [14]

Thereafter, the Respondent filed her Motion for Summary Judgment, and Return and Memorandum to the Petition on January 3, 2008. [17, 18] The Petitioner timely filed his Response on January 19, 2008. [22] Therefore, this case is ripe for review.

## IV.  DISCUSSION

### A.  Timeliness of the Petition

Petitioner filed his petition on August 24, 2007. Therefore, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply to this case. *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Breard v. Pruett*, 134 F.3d 615 (4th Cir.), *cert. denied*, 521 U.S. 371 (1998); *Green v. French*, 143 F.3d 865 (4th Cir. 1998), *cert. denied*, 525 U.S. 1090 (1999). This court has reviewed the pleadings and various documents filed by the Petitioner and has determined that the Petition is timely under the AEDPA.

### B.  Exhaustion of State Court Remedies

Relief under Section 2254 may be had only after a *habeas* petitioner has exhausted his state court remedies: "It is the rule in this country that assertions of error in criminal proceedings must first be raised in state court in order to form the basis for relief in *habeas*.

Claims not so raised are considered defaulted." *Breard v. Green*, 523 U.S. 371, 375 (1998), *citing Wainwright v. Sykes*, 433 U.S. 72 (1977); *see also* 28 U.S.C. § 2254(b). The theory of exhaustion is based on 28 U.S.C. § 2254, which gives the federal court jurisdiction of habeas petitions. *See generally, O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). The court's exhaustion requirements under Section 2254 are explained in *Matthews v. Evatt*, 105 F.3d 907, 910-911 (4th Cir.), *cert. denied*, 522 U.S. 833 (1997):

> In the interest of giving state courts the first opportunity to consider alleged constitutional errors occurring in a defendant's state trial and sentencing, a § 2254 petitioner is required to "exhaust" all state court remedies before a federal district court can entertain his claims. Thus, a federal habeas court may consider only those issues which have been "fairly presented" to the state courts[.]
>
> To satisfy the exhaustion requirement, a habeas petitioner must fairly present his claim to the state's highest court. The burden of proving that a claim has been exhausted lies with the petitioner.
>
> The exhaustion requirement, though not jurisdictional, is strictly enforced[.]  (Citations omitted)

Thus, if claims were never reviewed by the highest court in South Carolina, those claims will be barred and cannot be considered by the Court. A claim is unexhausted unless the substance of a petitioner's claims are "fairly presented" to the state courts, *Matthews v. Evatt*, 105 F.3d at 911, or no state remedy remains available. *Id.* To fairly present a claim, a petitioner must "include reference to a specific federal constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (*citing Picard v. Connor*, 404 U.S. 270, 271 (1971)).

To satisfy the exhaustion requirement, a habeas petition must fairly present his claim to the state's highest court. The burden of proving that a claim has been exhausted lies with the petitioner. The exhaustion requirement, though not jurisdictional, is strictly enforced. *Matthews v. Evatt*, 105 F.3d at 910-11 (citations omitted).

In South Carolina, a person in custody has two primary means of attacking the validity of his conviction. The first method involves a direct appeal and, pursuant to state law, a petitioner is required to state all his grounds in that appeal. *See* SCAR 207 *and Blakeley v. Rabon*, 266

S.C. 68, 221 S.E.2d 767 (1976).  The second method involves the filing of an application for relief under the South Carolina Post Conviction Procedure Act, S.C. Code Ann. §§ 17-27-10–160.  The applicant may allege constitutional violations in a post-conviction relief ("PCR") proceeding, but only if the issue could not have been raised by direct appeal.  *Gibson v. State*, 329 S.C. 37, 41, 495 S.E.2d 426, 428 (1998), *citing* S.C. Code Ann. §§ 17-27-20(a)(1), (b).  A PCR applicant is also required to state all of his grounds for relief in his application.  *See* S.C. Code Ann. § 17-27-90.  "Exhaustion includes filing of an application, the rendering of an order adjudicating the issues, and petitioning for, or knowingly waiving, appellate review."  *Gibson v. State*, 329 S.C. at 42, 495 S.E.2d at 428.  As the South Carolina Supreme Court has explained: "[W]hen the claim has been presented to the Court of Appeals or the Supreme Court, and relief has been denied, the litigant shall be deemed to have exhausted all available state remedies.  *In Re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, 321 S.C. 563, 564, 471 S.E.2d 454, 454 (1990).

Just as the exhaustion doctrine requires that a claim be fairly presented to all appropriate state courts before it is raised in a Section 2254 petition, if a claim has not been presented but no state remedy remains available, the claim will be considered procedurally defaulted. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).  A claim that has been procedurally defaulted in state court usually will not be reviewed in a Section 2254 petition.  A federal court will hear a procedurally defaulted claim only if the petitioner " 'can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice.' "  *Matthews v. Evatt*, 105 F.3d at 916, *quoting Coleman v. Thompson*, 501 U.S. at 750 (emphasis supplied by the undersigned).  Unless a petitioner can demonstrate both "cause" and "prejudice", this Court will be procedurally barred from considering those claims that are procedurally defaulted.  *Daniels v. Lee*, 316 F.3d 477, 486 (4th Cir. 2003).

Here, Petitioner raises two Arguments in support of his claim that he is entitled to habeas corpus relief. The first allegation is an effort to overcome a perceived procedural default because Argument II was not presented to the state supreme court on certiorari, after the state court of appeals affirmed his conviction and sentence. However, Respondent does not assert a failure to exhaust by Petitioner based upon the fact he did not file a petition for certiorari in the state supreme court following the adverse decision by the state court of appeals, as permitted by Rule 226, SCACR, because the state supreme court has held that discretionary review by the state supreme court from a decision of the state court of appeals is "outside of South Carolina's 'ordinary appellate procedure' pursuant to *O'Sullivan*." *State v. McKennedy*, 348 S.C. 270, 277, 559 S.E.2d 850, 854 (2002) (citing *In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, 471 S.E.2d 454, 454 (S.C. 1990), and holding that "it effectively places discretionary review by this Court outside of South Carolina's 'ordinary appellate procedure' pursuant to O'Sullivan"). Furthermore, Petitioner asserted in Argument Two that he was denied his right to a speedy trial, in the state court of appeals on direct appeal. Therefore, the allegation is exhausted.[3] Therefore, the exhaustion requirement is satisfied.

### C. Scope of Review

This Court's review of collateral attacks on state criminal convictions is governed by the parameters set forth in the AEDPA, which amended Section 2254. Under the AEDPA, the state court's adjudication of a petitioner's claims on their merits is accorded deferential review. *Cummings v. Polk*, 475 F.3d 230, 237 (4th Cir. 2007). A federal court may only grant habeas corpus relief under Section 2254(d) with respect to a claim adjudicated on its merits in a state court proceeding if that state court's adjudication: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by

---

[3]    Also, Petitioner does not have any state court remedies available to him because any future PCR application would be untimely under the one-year statute of limitations which governs the filing of PCR actions. S.C. Code Ann. § 17-27-45(A) (Supp. 2006).

the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See Daniels v. Lee*, 316 F.3d 477, 485 (4th Cir. 2003), *quoting* 28 U.S.C. §§ 2254(d)(1) & (2); *see also Byram v. Ozmint*, 339 F.3d 203 (4th Cir. 2003).

With respect to the first prong of the analysis, the United States Supreme Court has explained that a state court adjudication is "contrary to" clearly established Federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). An "unreasonable application" of Federal law will be found "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 412-413. An "unreasonable application" likewise will be found if the state court "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled. *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000) (opinion of Kennedy, J.). Yet, as *Williams* teaches, a state court's "unreasonable application" of the law informs the federal court to the extent that the latter "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Bates v. Lee*, 308 F.3d 411, 417 (4th Cir. 2002), *cert. denied,* 538 U.S. 1061 (2003), *quoting Williams*, 529 U.S. at 411.

Turning to the second prong of the analysis, Section 2254(d)(2)'s determination of whether there exists an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" is framed by Section 2254(e)(1), which provides that the findings of fact by a state court are entitled to a "presumption of correctness" and the petitioner must bear the burden of rebutting that presumption by "clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1). The federal courts must accord "considerable deference in their review of

state habeas proceedings." *Lovitt v. True*, 403 F.3d 171, 178 (4th Cir. 2005), *citing (Terry) Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Thus, even if an error were identified in the record, "the habeas petitioner will be entitled to relief only if the habeas court is 'in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" *Jones v. Polk*, 401 F.3d 257, 265 (4th Cir. 2005), *quoting O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (internal quotation marks and citation omitted). As *Jones* explains, "[t]he proper inquiry is not 'merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Jones*, 401 F.3d at 265, *quoting Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

When Congress crafted this deferential standard of review in the AEDPA, it was at least partially motivated "to limit federal intrusion into state criminal adjudications." *(Michael) Williams v. Taylor*, 529 U.S. 420, 436, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). As Judge Wilkinson observed in *Lovitt*, "[i]t is, after all, the job of state courts to faithfully apply federal law. U.S. Const., Art. VI, cl. 2. Their efforts in this regard are to be respected as the acts of sovereign entities, whose sworn allegiance to the Constitution and the laws of the United States is as solemn as our own." *Lovitt*, 403 F.3d at 178.

### V.  Discussion of Petitioner's Grounds for Habeas Corpus Relief

Ground One:            Petitioner's Speedy Trial Rights were Violated

Supporting Facts:      Petitioner was indicted in June of 2000 and not brought to trial until
                        August of 2004.  The Solicitor conceded that there was no good reason
                        for the delay.

As discussed earlier, Petitioner first alleges that the Court should excuse a perceived procedural default because Argument II was not presented to the state supreme court on

certiorari, after the state court of appeals affirmed his conviction and sentence.  However, Respondent does not assert a procedural based upon the fact he did not file a petition for certiorari in the state supreme court, following the adverse decision by the state court of appeals, as permitted by Rule 226, SCACR, because the state supreme court has held that discretionary review by the state supreme court from a decision of the state court of appeals is "outside of South Carolina's 'ordinary appellate procedure' pursuant to *O'Sullivan*."  *State v. McKennedy*, 348 S.C. 270, 277, 559 S.E.2d 850, 854(2002) (*citing In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, 471 S.E.2d 454, 454 (S.C. 1990), and holding that "it effectively places discretionary review by this Court outside of South Carolina's 'ordinary appellate procedure' pursuant to *O'Sullivan*").

In Argument II, Respondent contends, and this court agrees, that the state courts' rejection of Petitioner's claim was not "*contrary to*" and did not involve an "unreasonable application of" clearly established United States Supreme Court precedent.  § 2254(d)(1).  Prior to trial, Petitioner' attorney moved to dismiss the charge because of the over four-year delay in bringing Petitioner to trial.  Defense counsel noted that the case was dismissed at a preliminary hearing in May 2000, and Petitioner was directly indicted in June 2000.  Defense counsel argued that Petitioner was prejudiced at the time of trial because "witnesses move about," and he was unable to locate a Dr. James Foutty, who would testify that no semen was found on T. W.'s body.  (R. 29-31).  Counsel further argued that T. W. was now eleven years old, and "we're relying on testimony from what a child of six years old remembers happening four years ago. . . . It's prejudicial just in the fact we're relying on a person who is not even a teenager to recall events from more than four years ago."  (R.32).  Defense counsel did admit, however, that no speedy trial motion was made before trial.  He also stated, "the defendant was out of jail [and] he was not arraigned or brought before the Court until February of 2002."  (R. 32).

In response, the assistant solicitor noted, "there's no allegations by the State that semen was deposited on [T.W.'s] body," and "I am bringing Dr. Amick who . . . tested some things that

did not develop a DNA profile." (R. 31). He also informed the court that Petitioner was out on bond during the period before trial. (R. 33; *see* Arrest Warrant & Bond Discharge, R. 354-55).

The assistant solicitor then gave the following explanation for the delay in bringing Petitioner's case to trial:

> There are 100 reasons, none of which are going to be acceptable. . . . One is we have cases that are older than this that we haven't gotten to yet. We don't have enough court time to move cases in a timely fashion and that's not a good excuse. Another is that we discovered that we had in fact seized some physical items. In my preparation of this case months and months - - actually a couple of years ago I determined that we had basically sat on those items at the sheriff's office, nothing had been done with them. In fairness to everybody we felt like we needed to send them to SLED to see what they could do with it. We did that - - a sample was listed by SLED's DNA processing department from one article of clothing. We now had something maybe to be compared with the blood samples from the victim and the defendant. I then tried to get [defense counsel] to see if his client would consent to the submission of his blood sample, he wouldn't. We had to go through the process of a motion and doctors appointments to get all of that done. So all of it is not our fault. We finally got the blood sample, we sent it to SLED, the reports came back and then I scheduled it for trial.

(R. 33-34).

Although the trial judge stated that he was "very concerned" with the age of this and other cases in the Sixth Circuit, he found that this case "doesn't reach the point . . . where I would grant [defense counsel's] motion to dismiss." The trial judge noted, "I don't feel that you've shown me enough prejudice in the delay of the case," and he denied the motion to dismiss. (R. 34-35. As discussed, the state court of appeals affirmed the trial judge's ruling in an unpublished decision. *State v. Snipes*, 06-UP-363 (S.C. Ct.App., Oct. 24, 2006). That Court found that:

> Snipes was not incarcerated on this charge but for a few days. However, his liberty was clearly impaired and his life disrupted during the considerable period of time he was out on bond. Snipes was arrested mid-March of 2000. While the charges were dismissed two months later, he was then indicted on June 15, 2000, only one month later, and the charge remained hanging over his head until the time of trial in early August 2004. Accordingly, the length of delay in this matter is four years and three and a half months.

*Id* at 7 (citations omitted). Based on the Assistant Solicitor's representations at trial, *id*, the Court further found that:

> [T]he delay was due in part to an overcrowded docket and the State's failure to promptly have some of the evidence tested. However, the record shows the solicitor took steps to have the items tested once he became aware of their existence. Further, it should be noted that Snipes also contributed to the delay. In June 2002, after discovering further testing was needed on the red t-shirt seized by the officers, the solicitor filed a motion requesting Snipes submit to a blood test in order to speed up the process of testing. Snipes opposed the motion, necessitating a hearing on July 30, 2002. While Snipes was well within his rights to challenge his submission to a blood test, he cannot now claim this additional delay was attributable to the State. Finally, there is simply no evidence the State purposely delayed Snipes' trial. *See Kennedy*, 339 S.C. at 250, 528 S.E.2d at 704(noting absence of evidence of purposeful delay by State in considering reason for delay factor in speedy trial analysis); *Barker*,407 U.S. at 531 (finding deliberate attempt to delay a trial in order to hamper the defense should be weighted heavily against the government while a more neutral reason such as negligence or overcrowded docket should be weighted less heavily).

*Id.* at 8. As to the remaining factors, the Court concluded that:

> Next, we must consider when and how Snipes asserted his right to a speedy trial. The record shows Snipes did not make a motion concerning the delay until the day of trial. While Snipes contends he complained of the delay during the July 30, 2002 hearing, a thorough reading of the record shows Snipes never placed any objection on the record in regard to the delay prior to the day of trial. Rather, as previously noted, the transcript from that hearing shows the solicitor was very concerned with the delay in bringing the matter to trial and that this prompted his motion for Snipes to submit to the blood test. Snipes objected at the hearing only to the intrusion of a blood test based on the solicitor's admission the seized items had been "coming back [with] negative [results]." Snipes maintained that, "since it's been that long," to send a blood sample in with the other items"creates a possibility of suspicion as to how the analysis was conducted." Further, Snipes conceded during his motion to dismiss based on his speedy trial violation that he had not brought the matter to the court's attention and had not made a motion for speedy trial or to dismiss until the day of trial. Accordingly, Snipes failed to assert this right until the trial was ready to start. *See also Robinson*, 335S.C. at 626, 518 S.E.2d at 272 (finding appellant's letters written to solicitor and Chief Administrative Judge indicating he was ready for trial were insufficient to trigger assertion of appellant's right to a speedy trial and such right was not asserted until he filed his formal motion to dismiss).

> While the United States Supreme Court rejected the demand-waiver rule as applied to the right to a speedy trial in Barker, the manner in which the defendant asserts his right thereto is nonetheless an important factor to be considered. *Waites*, 270 S.C. at 108, 240S.E.2d at 653. In *Barker*, the court considered the fact that Barker did not want a speedy trial to be '[m]ore important than the absence of serious prejudice." *Barker*, 407 U.S. at 534. The court noted, the more serious the deprivation, the more likely the defendant is to complain, and a defendant's assertion of his speedy trial right is entitled to strong evidentiary weight in determining whether he has been deprived of the right. Id. at 531-32. The court added, "[w]e emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." Id. at 532. Accordingly, Snipes' failure to assert his right to a speedy trial until the day the trial began

militates strongly against him in his argument that he was denied his right to a speedy trial.

Lastly, we must examine whether Snipes suffered prejudice as a result of the delay. In considering this factor, the *Barker* court noted it should be assessed in light of the interests of defendants the speedy trial right was designed to protect. *Barker*, 407 U.S. at 532. These interests include: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. *Id.* Of these, the most serious is the impairment of the defense, because the inability of a defendant to adequately prepare his case skews the fairness of the entire system. *Id.; see also Kennedy*, 339 S.C. at 250, 528 S.E.2d at 704 (*quoting Barker*).

On appeal, Snipes asserts he was prejudiced by the delay because the evidence showed Victim's memory was faulty, the only evidence against him was that of Victim's testimony, and her credibility was bolstered by the five witnesses who corroborated her allegation of sexual abuse. . . . The court in *Barker* noted there is prejudice if defense witnesses are unable to recall accurately events of the distant past. *Barker*, 407 U.S. at 532. However, Snipes does not contend he or any of his other witnesses were unable to recall the events surrounding this case. Rather, he claims prejudice in Victim's inability to remember the events. Further, the Barker court also noted that deprivation of the right to a speedy trial may sometimes work to an accused's advantage. *Id.* at 521. Specifically, the court discussed how, as the delay between commission of a crime and the trial increases, witnesses may become unavailable and memories may fade. However, where the witnesses support the prosecution, it is the prosecution's case that will be weakened, sometimes seriously so, as it is the prosecution that carries the burden of proof. *Id.* This is precisely what occurred in the case at hand. The fact that Victim had some difficulty remembering what happened on the day in question was well explored by defense counsel, and used to Snipes' advantage in attacking Victim's credibility. Thus, considering the fact that Snipes was able to attack Victim's credibility, showing little, if any, impairment to his defense, along with the fact that Snipes was incarcerated very briefly prior to his trial, we conclude there was minimal prejudice to Snipes.

Although the delay of over four years is substantial, upon our review and balancing of the Barker factors, we find Snipes was not denied his constitutional right to a speedy trial and the trial court properly denied Snipes' motion to dismiss.

*Id.* at 8 (footnote omitted).

Every person accused of a crime is entitled to a speedy trial under Article I, §14 of the Constitution of South Carolina, as well as the Sixth and Fourteenth Amendments of the Constitution of the United States. *Klopfer v. North Carolina*, 386 U.S. 213 (1967). Whether or not a person accused of crime has been denied his constitutional right to a speedy trial is a question to be answered in the light of the circumstances of each case. A speedy trial does not

mean an immediate one; . . . it simply means a trial without unreasonable and unnecessary delay. *Wheeler v. State*, 247 S.C. 393, 400, 147 S.E.2d 627, 630 (1966).  . *State v. Robinson*, 335 S.C. 620,518 S.E.2d 269, 272 (Ct. App. 1999).

Notwithstanding Petitioner's argument to the contrary, it appears to the court that the South Carolina court of appeals' decision was not "contrary to" and did not involve an "unreasonable application of" clearly established United States Supreme Court precedent.  § 2254(d)(1).  The United States Supreme Court adopted a four-part balancing test to be used in determining whether a defendant has been denied the right to a speedy trial:  (1) the length of the delay;  (2) the reason the government uses to explain the delay;  (3) when and how the defendant asserted his speedy trial right; (4) and the prejudice to the defendant.  *Barker v. Wingo*, 407 S.C. 514 (1972).  South Carolina likewise has recognized these factors in a speedy trial analysis. *State v. Brazell*, 325 S.C. 65, 480 S.E.2d 64 (1997); *State v. Smith*, 307 S.C. 376, 415 S.E.2d 409 (Ct. App. 1992).  The purpose of the Sixth Amendment right is not primarily to prevent prejudice but to minimize the possibility of lengthy incarceration before trial, to reduce the impairment of liberty, and to shorten the disruption of life.  *United States v. MacDonald*, *supra*, 456 U.S. 1, 8-9 (1982).  No single factor is necessary or sufficient.  *Barker*, 407 U.S. at 533.

Applying these four factors to the case at hand, the first factor, the length of delay, "is to some extent a triggering mechanism[,]" so that "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors. . . ."  *Barker*, 407 U.S. at 530.  *Barker* does not set forth a specific time which constitutes a"length of delay" that requires a complete inquiry into the other three factors, but states that it should be determined by the peculiar circumstances of the case.  *Id*.  In *State v. Chapman*, 289 S.C. 42, 344 S.E.2d 611 (1986), the state supreme court reversed the trial court's decision to quash the defendant's indictment based on the state's failure to give him a speedy trial.  In *Chapman*, there was a 5 and ½ year delay between the defendant's first arrest and the motion to quash.  *Id.*, 289 S.C. at 43, 344 S.E.2d at 612.  The *Chapman* court reasoned that once charges are dismissed, the

speedy trial guarantee is no longer applicable. Therefore, the state supreme court considered only the three months between the defendant's initial arrest and the dismissal of the charges, and the nine months between the second arrest and the motion to quash. The court held that the total length of delay which should be considered under the speedy trial motion was one year. *Id.*, 289 S.C. at 45, 344 S.E.2d at 613.

In the case at bar, while there was more than a four-year delay between Petitioner's June 15, 2000 indictment and his August 2004 trial,[4] this delay cannot be said to be such an unreasonable length so as to be presumptively prejudicial. *See Barker v. Wingo*, *supra* (delay of five years); *contra Doggett v. United States*, 505 U.S. 647 (1992) (eight and one-half year delay between indictment and arrest held presumptively prejudicial). Moreover, while the four year delay would ordinarily trigger review of the other three factors, it is significant that Petitioner was released on bond two days after his arrest, on March 20,2000, and he remained free on bond up until he was convicted. (R. 354-55). Thus, Petitioner was in jail for only two days.

The undersigned find that the decision by the state court of appeals in this regard is not objectively unreasonable under Section 2254(d)(2), and that Petitioner cannot rebut the presumption of correctness accorded this finding by clear and convincing evidence. Section 2254(e)(1); *see also Roberts v. State*, 361 S.C. 1, 602 S.E.2d 768 (2004); *Drayton v. Evatt*, 312 S.C. 4, 430 S.E.2d 517(1993) (noting that great deference is given to the PCR court's findings when matters of credibility are involved because the federal habeas court lacks the opportunity to

---

[4]    The Sixth Amendment Speedy Trial Clause does not apply until the defendant has been accused by indictment (or other criminal charge). *United States v. Marion*, 404 U.S. 307, 313 (1971). *See also United States v. MacDonald*, 456 U.S. 1, 6 (1982). Pre-indictment delay is instead covered by the Fifth Amendment guarantee of due process. *United States v. Lovasco*, 431 U.S. 783, 788-789 (1977). A statute of limitations, where one exists, is the primary guarantee against the prosecution of overly stale charges. *Id.* Beyond that protection, the Fifth Amendment protects against government delay used as a deliberate device to gain a tactical advantage that causes actual prejudice. *Id.* at 789-90; *see also United States v. Gouveia*, 467 U.S. 180, 192, 104 S.Ct. 2292, 2299 (1984). *Lovasco*, however, cautions that the Due Process Clause has a limited role to play in protecting against oppressive delay. *Id.* at 789; *United States v. Pallan*, 571 F.2d 497, 500 (9th Cir. 1978).

directly observe the witnesses).  In the present case, Petitioner was able to go about his business, and he failed to demonstrate any unusual anxiety or concern caused by the delay beyond what would ordinarily result from being charged with a serious offense.  In fact, Petitioner even married T.W.'s mother in 2003.  Absent any impairment of liberty, or evidence of a serious disruption of his life in this case, there has been no showing of a presumptively prejudicial delay to warrant review of the other factors.  *State v. Waites*, 270 S.C.104, 240 S.E.2d 651, 653 (1978) (holding there was no speedy trial violation, and noting the defendant was neither incarcerated nor apparently concerned about the accusation against him).

Even considering the other *Barker* factors, a different result does not obtain.  With respect to the second prong of the test, the court must analyze the State's justification for the delay.  The *Barker* Court cautioned "different weights should be assigned to different reasons." 407 U.S. at 531.  As discussed earlier, a portion of the delay was caused by the docket in the Sixth Circuit.  Any delay beyond this was due to the State's attempt to analyze DNA evidence and to obtain a blood sample from Petitioner, and then await the return of the tests results.  On July 30, 2002, there was a hearing on the State's motion to compel Petitioner to submit to a blood sample for comparison, which suggests to this court that Petitioner is partly to blame for the delay.  (R. 341-52).  Petitioner has not shown any evidence that the delay was the result of willful or intentional neglect by the State.  *State v. Kennedy*, 339 S.C. 243, 528 S.E.2d 700 (Ct. App. 2000); *see also, Robinson, supra* (the defendant has the burden to demonstrate willful neglect by the State caused the delay).

Third, defense counsel readily admitted at trial that Petitioner failed to demand a speedy trial.  While the United States Supreme Court in *Barker* rejected the demand-waiver rule as applied to the right to a speedy trial, "the manner in which the defendant asserts his right thereto is an important factor to be considered."  *Waites,* 240 S.E.2d at 653 (*citing Barker*).  Indeed, the *Barker* Court noted, "[w]e emphasize that failure to assert the right will make it difficult for a

defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532; *Waites*, 240 S.E.2d at 653; *see also Robinson*, 518 S.E.2d at 272 (same).

Petitioner's failure to assert a speedy trial should weigh more heavily against him as the delay got longer; the longer the delay, the more likely a defendant who really wants a speedy trial would logically take some action to obtain it.  Defense counsel noted at the July 2002 hearing that the then two-year delay in bringing Petitioner' case to trial "creates a possibility of suspicion as to how [the prior DNA analysis] was conducted"  (R. 349, lines 10-19).  Contrary to his assertion on appeal, however, he did not argue for a speedy trial in 2002, and there is no record of him demanding a speedy trial at <u>any time</u>, as admitted by defense counsel at trial.  Significantly, too, the same attorney who represented Petition at trial represented him at the July 2002 hearing.

The final *Barker* factor focuses on the prejudice, if any, the defendant has suffered as a result of the delay.  *Barker* suggests that prejudice must be assessed in light of the interests the right to a speedy trial was designed to protect; to prevent oppressive pretrial incarceration; to minimize anxiety to the accused; and to limit the possibility that the defense will be impaired.  The most profound prejudice would be the possibility that the defense was impaired.  *Barker*, 407 U.S. at 532.  Petitioner is required to show actual prejudice resulting from the delay which impaired his defense.  *Barker, supra; Robinson, supra; Smith, supra; see Waites, supra* (defendant's bare assertion of prejudice because witness moved was insufficient to conclude defendant suffered actual prejudice).

Petitioner asserts prejudice because T.W.'s memory since the time of the incident was"incredibly poor," and further, that he was denied the opportunity to confront his accuser before her memory and her story had been tampered with and influenced by others.  However, the record shows the contrary, as Petitioner did have this opportunity during the cross-examination of the State's witnesses.  For example, during the cross-examination of the State's witnesses, defense counsel noted that T.W. never reported that she was on her stomach when she

performed oral sex on Petitioner. (R. 138, 143, 147). During T.W.'s cross-examination, defense counsel questioned her ability to remember the details of the incident some five years before. She admitted that she never reported that she was lying on the bed on her stomach. (R. 98-100). She testified that she sometimes had to look at "papers" to remember things about the incident; and she admitted that she spoke with people about it. (R. 99-104, 108-09). Furthermore, T.W. could not remember any prior incident about stealing money from her mother's purse. (R. 96-97). In other words, Petitioner was more than able to attack T.W.'s credibility at trial based on her ability to recall the incident, and her dependence on other sources to remember the events over four years earlier. The court agrees with the State that Petitioner's arguments regarding prejudice in this regard lack merit, because the same disadvantages alleged by him hampered the State in its case, even more so than Petitioner. *Chapman, supra; Robinson, supra; see Smith, supra* (no prejudice found where faded memories of witnesses also hampered the State).

The defense further suggested at trial that T.W.'s allegation against Petitioner was caused by the bad blood between her biological father and Petitioner. T.W.'s mother claimed that she broke up with T.W.'s father in 1994 because he had a relationship with Petitioner's then-girlfriend. (R. 72-73, 165-66, 179-80). There also was testimony that T.W.'s mother filed an action in family court with T.W.'s father in 1995, and that she had custody of their children as a result. (R. 73). However, since the allegation was made against Petitioner, T.W. and her brother had lived with their biological father, his wife, and their children in Kentucky, and there was an on-going family court case. (R. 70, 74, 167, 179). Thus, the defense was able to present possible motives to fabricate the allegation against Petitioner.

Petitioner also relies on the State's lack of credible corroborative evidence of the sexual assault. He contends the State presented "copious, self-serving" corroborative evidence in the form of hearsay statements from its witnesses to bolster T.W.'s credibility. Petitioner cites to testimony from State witnesses which corroborated that T.W. complained of the sexual assault. However, it is well-settled that, because T.W. testified, corroborative evidence from other

witnesses that she complained of the sexual assault was admissible, limited to time and place of the assault and excluding the details and particulars. *Simpkins v. State*, 303 S.C. 364, 401 S.E.2d 142 (1991); *State v. Douglas*, 367 S.C. 498, 626 S.E.2d 59 (Ct. App. 2006). Here, the witnesses' testimony clearly fell within the limited corroborative testimony allowable in criminal sexual assault cases.[5]

Further, the credibility of the State's evidence, and the absence of physical evidence of sexual abuse or other corroborative evidence, was duly noted at trial by defense counsel. As previously discussed, the State's own expert admitted the absence of semen on T.W.'s body and the other items tested from the house. The lack of additional corroborative evidence was not the result of delay. Because it was the State's burden to prove his guilt beyond a reasonable doubt, the absence of corroborative evidence would work to Petitioner' benefit in any event, and it was an issue of the credibility of the evidence presented by the State rather than a demonstration of actual prejudice as a result of the lack of a speedy trial. Balancing the *Barker* factors above, Petitioner was not denied his constitutional right to a speedy trial. He has failed to show any witnesses or evidence that were unavailable because of the delay, or that his ability to challenge the charge against him was impaired. The trial judge properly denied Petitioner' motion to dismiss the charge.

---

[5]     As the State points out to the court (Resp. Return at p. 23, n. 7), there was no objection at trial to the State's corroboration testimony. (R. 124-25, 141-32, 145-46, 156-57, 192). Therefore, Petitioner could not complain about this testimony for the first time on appeal. *State v. Simpson*, 325 S.C. 37, 479 S.E.2d 57 (1996).

**RECOMMENDATION**

For the foregoing reasons, it is recommended that Petitioner's Petition **[1] be dismissed**, and that the Respondent's motion for summary judgment **[17] be granted.**

GEORGE C. KOSKO
UNITED STATES MAGISTRATE JUDGE

August 13, 2008

Charleston, South Carolina

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail.  Fed. R. Civ. P. 6(a) & (e).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
P.O. Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).